# ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of -- | ) |
| | ) |
| Distributed Solutions, Inc. | ) ASBCA No. 57266 |
| | ) |
| Under Contract No. F41999-99-C-0027 | ) |

APPEARANCES FOR THE APPELLANT:    Stephen M. Faraci, Sr., Esq.
Thomas A. Coulter, Esq.
   LeClairRyan
   Richmond, VA

APPEARANCES FOR THE GOVERNMENT:    Col Robert J. Preston II, USAF
   Acting Air Force Chief Trial Attorney
Christine C. Piper, Esq.
Skye Mathieson, Esq.
   Trial Attorneys

## OPINION BY ADMINISTRATIVE JUDGE CLARKE

Distributed Solutions, Inc., (DSI) claims that the Air Force Non-Appropriated Fund Purchasing Office (AFNAFPO) must pay it a license fee for using the Internet-Based Purchasing System (IBPS) software that it owns. The AFNAFPO agrees that DSI owns the software, but contends that it has the right to use its version of the IBPS at no cost.

## FINDINGS OF FACT

### Order No. F41999-97-F-6019

1. Order No. F41999-97-F-6019 (6019) under Contract No. 263-97-D0334 was awarded by AFNAFPO, San Antonio, Texas, to GCG Computers (GCG) on 8 October 1997 to develop an IBPS (R4, tabs 54, 73). The $392,385 contract listed three contract line item numbers (CLINs):

> 0001   Software Development, CLIN 6175, convert the
> Electronic Commerce Purchasing System (ECPS) from
> a DOS based program to an internet/intranet program
> in accordance with the attached statement of work,
> requirements incorporated by the question answer

session of the pre-proposal conference, and the proposal submitted by GCG. ($376,000.00)

0002 Training, CLIN 9002, training of 50 Agency personnel either at 9504 IH 35 N or Airport Center Building in San Antonio TX. ($12,500.00)

0003 NIH administrative fee, CLIN 9999, 1 % of total. ($3,885.00)

(*Id.*) Delivery was specified as 30 September 1998 (*id.*).

2. The "Statement of Work Development of Internet-based Purchasing System" (SOW) had the stated objective: "To obtain customized software or existing commercial-off-the-shelf (COTS) software that will be modified to meet 100 percent of the specifications in this statement of work" (R4, tab 55 at 190, tab 73 at 292). The SOW set forth the organizational structure that must be supported, a description of the current Electronic Commerce Purchasing System (ECPS) and the "System Requirements" for the IBPS (R4, tab 55 at 189-95, tab 73 at 291-97).

3. Judd's, Inc., the major subcontractor working with GCG, submitted the technical proposal that was physically included in the contract at award (R4, tabs 57, 73 at 272-90). Part II of Judd's, Inc.'s proposal, "Proposed Solutions and Associated Costs" discussed Architecture, Project Development Process, Project Development Milestones, Delivery Time, and Technical Support (R4, tab 57 at 217, tab 73 at 284). The Architecture section lists a variety of primarily Microsoft® commercial COTS products that would be employed to provide the required customized solution (R4, tab 57 at 217-20, tab 73 at 284-87). The Source Code Management paragraph provided that "*all* source code developed specifically for the project will be delivered with the project as part of the baseline fixed cost" (R4, tab 57 at 219, tab 73 at 286). The Project Development Milestones included two prototypes, a system pilot and system implementation. After system implementation, a 90-day warranty period went into effect followed by help desk support. (R4, tab 57 at 221-22, tab 73 at 288-89)

4. The two copies of the 6019 Order in the record do not have a list of clauses incorporated by reference or any provisions addressing intellectual property (R4, tabs 54-57, 73)[1]. The copy of the 6019 Order in DSI's supplement to the Rule 4 included, "Answers to Questions Posed Regarding the Internet-based Purchasing System" that included the following:

---

[1] The record does not contain the terms and conditions of Contract No. 263-97-D0334.

**Q26. What rights does AFNAFPO expect to retain with respect to the internet purchasing system?**

A26. We expect to be able to provide the full range of purchasing functionality offered by the internet purchasing system to all government NAF entities. We need to remove the DoD stipulation from the arrangement as made with Loren Data, as Coast Guard installations (DoT) use NAF funds, as well as a small handful of other government offices, i.e. the CIA dining room in the Pentagon.

(R4, tab 73 at 309, 314) The IBPS was not completed under the 6019 Order.

Contract No. F41999-99-C-0027

5. On 19 August 1999, Contract No. F41999-99-C-0027 (0027) in the total amount of $276,700 was awarded by AFNAFPO to Judd's Online, Inc. ("Judd's") for completion of the IBPS (R4, tab 1). The contract included seven CLINs:

0001 – Completion of software development for Internet Based Purchasing System (IBPS). System shall be an internet/intranet program in accordance with the attached statement of work (SOW). A core system (including User's Guide) will be completed and tested no later than 30 November 1999. System will be upgraded to SQL 7. $199,700

0002 – Installation of existing system. Installation shall be completed no later than 31 August 1999....$7500

0003 – Maintenance program for the IBPS – This is an annual maintenance program with an option to extend annually up to 5 years from original start date....$50,000 annually

0004 – Help Desk – This is an annual help desk program with an option to extend up to 5 years from original start date.... $15,000 annually

0005 – 100% system installation....$7500

3

0006 – Training–Training includes no more that 50 personnel per session, situated at the Headquarters Services Agency or the AFNAFPO....$12,000 annually

0007 – Enhancements: Scope, price, and performance period of program enhancements shall be negotiated between the parties.

(*Id.* at 2) The period of performance was "5 years from the signature date of the contracting officer with an option to extend an additional 5 years" (*id.*). Attachments 1 and 2 to the 0027 contract identified and prioritized the development tasks remaining to be accomplished to complete the IBPS (R4, tab 1 at 20, tabs 2, 3).

6. The IBPS was to replace a DOS-based ECPS still being used by AFNAFPO at the time of contract award (R4, tab 1 at 5). The "Objective" in the Statement of Work was "[t]o obtain customized software or existing commercial-off-the-shelf (COTS) software that will be modified to meet 100 percent of the specifications in this statement of work" (*id.* at 3). The contract at award did not include an intellectual property rights provision. There was no provision requiring AFNAFPO to pay royalties to use the IBPS.

7. On 18 October 2000, Judd's (Transferor), SMC Interactive, Inc., (SMC) (Transferee) and the AFNAFPO contracting officer signed a novation agreement transferring contract 0027 from Judd's to SMC (R4, tab 7). Paragraph A.4 of the novation states: "The Transferee has assumed all obligations and liabilities of the Transferor under the contracts by virtue of the above transfer" (*id.* at 54). The novation agreement was incorporated into the 0027 contract by Modification No. 003 on 11 December 2000 (R4, tab 6).

8. Through a series of name changes, SMC became SMC Interactive c/o BlazeNet (BlazeNet), and eventually SMC Interactive, Inc., c/o Susquehanna Technologies, Inc., (SusQTech) (R4, tabs 8, 10; compl. ¶ 10).[2]

## Modification No. M0015

9. On 12 September 2003, Mr. Strimple, Partner SusQTech, emailed Ms. Jones, Chief, Policies & Procedures Branch, AFNAFPO, (tr. 2/161) an escrow and intellectual property document for her review that read in part:

AFNAFPO retains a perpetual non-exclusive license to utilize the IBPS system for the purpose of operating an electronic

---

[2] From here on we use "SusQTech."

4

eProcurement system within the AFNAFPO organization. This perpetual license may not be sold, transferred, assigned or conveyed to any third party.

(Supp. R4, tab 100 at 10017-18) Ms. Jones forwarded this document to Mr. Sawyer, Ms. Runkle and Mr. Woodard for review on 9 April 2004 (supp. R4, tab 100 at 10017). Ms. Runkle, an AFNAFPO contract specialist (tr. 2/199), testified about this language, "[i]t was what we wanted, continual never ending use of the source code" (tr. 2/219).

10. On 30 December 2004, Mr. Sawyer, AFNAFPO, sent Ms. Runkle the "latest wording from Doug [Stock, Director SusQTech] with the changes we asked for" (R4, tab 59 at 229, 60 at 228). The changed language read in part:

> ***AFNAFPO's rights to the IBPS system are hereby limited to its employment for the purpose of operating an electronic eProcurement system for the AFNAFPO organization. AFNAFPO's rights are continuous and nonexclusive.***

(*Id.* at 230) Ms. Runkle testified that this was an update of the "initial language" attached to the 9 April 2004 email (tr. 2/232; supp. R4, tab 100 at 10018). Ms. Runkle recalled that when "they" were reviewing Modification No. M0015 (Mod. M0015) they asked that the language "perpetual license" not be used because "[w]e were not paying licensing for IBPS and that is why we requested that we not use the term perpetual license in the modification" (tr. 3/27). Ms. Runkle explained, "[w]e paid to have the application developed. It belonged to us, we wanted it, it was ours....[T]he whole idea of developing IBPS [was] so that they would not have to pay costs to use the system." (Tr. 2/234) She testified that the word "continuous" that replaced the word "perpetual" meant the same thing – "[c]ontinuous being forever" (tr. 2/235-36).

11. In a 5 January 2005 email to Mr. Stock (SusQTech), Ms. Runkle asked about the intellectual property language, "[i]n my layman's terms I take this to mean that 'the second reference of AFNAFPO', encompasses not only AFNAFPO but all DOD NAFs using IBPS in its current instance" (R4, tab 60 at 227). Mr. Stock replied:

> Your understanding is correct. If Navy NAF engages you, and therefore hopefully SusQtech, to build significant new functionality into IBPS, and that new functionality is built into your instance of IBPS, you are within the terms of this agreement. If any NAF organization within DoD wants to leverage your instance of IBPS to purchase the products you have under contract, you are within the terms of this

5

agreement.  I do not think you are limited to who may use your instance of the application, as long as it is your instance.

(*Id.*)  Ms. Runkle explained that AFNAFPO wanted to be sure that other services within DoD could use the Air Force NAF's instance[3] of IBPS at no cost to them and she was satisfied with Mr. Stock's response (tr. 2/241).

12.  By Mod. M0015, dated 31 January 2005, AFNAFPO and SusQTech incorporated an intellectual property rights clause in the IBPS contract:

> The purpose of this modification is to incorporate the following Intellectual Property Rights to the contract for the IBPS system.
>
> AFNAFPO's rights to the IBPS system are hereby limited to its employment for the purpose of operating an electronic eProcurement system for the AFNAFPO organization. AFNAFPO's rights are continuous and non-exclusive.
>
> All source code used for the development and deployment of the IBPS system will be placed in escrow and updated in conjunction with the deployment of new software versions. In the event Susquehanna Technologies, Inc. ceases operation, is acquired or merged, or should AFNAFPO choose to either support and build upon the IBPS system itself, or engage a third party to provide support and enhancements for AFNAFPO, AFNAFPO is granted authorization to retrieve all source code from the escrow system.
>
> All deliverables and other materials created by Susquehanna Technologies, Inc. in the course of performance of its obligations hereunder, including, without limitation, the project components, all software object and source code, developer tools, and user manuals (collectively the "Deliverables"), shall remain the intellectual property of Susquehanna Technologies, Inc.  Susquehanna Technologies, Inc. reserves the right to resell and distribute said intellectual property.  AFNAFPO shall not sell, transfer or assign Deliverables to any third-party, nor will it allow any

---

[3] "Instance" is synonymous with "version."

6

> third-party to use Deliverables in whole or in part other than
> to support AFNAFPO. AFNAFPO retains the right to allow
> other DoD NAF entities to become users only on the existing
> instance of AFNAFPO IBPS. All rights not hereby
> specifically granted to AFNAFPO shall remain the sole
> property of Susquehanna Technologies, Inc.

(R4, tab 24) No money was placed on the contract by Mod. M0015.

13. Ms. Runkle wrote Mod. M0015 (tr. 2/247). She testified that Mod. M0015 "was the end result of the two years worth of effort on the language" (tr. 2/248). She testified that the paragraph starting with "AFNAFPO's rights to the IBPS system" meant, "[w]e, AFNAFPO, would have the right to continue forever to use the source code for the operation of our electronic eProcurement System known as IBPS" (tr. 2/248-49). Ms. Runkle testified that the paragraph starting with "[a]ll source code use for the development and deployment of the IBPS system" was intended to insure that AFNAFPO would always have access to the IBPS source code in escrow (tr. 2/249-50).

14. Ms. Jones is the deputy chief of AFNAFPO (tr. 2/161). From 1999 to 2001 she was IBPS project team lead and from 2001 to 2004 she was branch chief of the policies and procedures branch that was responsible for IBPS (tr. 2/164-65). In 2004 she was promoted to deputy director (tr. 2/166). Ms. Jones remained involved in IBPS when Mod. M0015 was signed (tr. 2/184). Ms. Jones testified that "Mod 15 gave us the right to use IBPS forever" (tr. 2/193).

15. In 2005 Mr. Henson was branch chief of the business systems section of AFNAFPO and he held an unlimited contracting warrant (tr. 3/63-64). He signed Modification M0022 and in preparation reviewed Modification M0015. Mr. Henson testified that Mod. M0015 addressed three points. The first, in paragraph one, "talks about the continuous use of IBPS and the rights of AFNAFPO to use that Software." (Tr. 3/65) The second paragraph "talks about source code and placing it in escrow" (*id.*). The third paragraph talks about SusQTech's rights in the software (tr. 3/65-66). He understood that AFNAFPO "had the right to use it [IBPS] forever and without any restriction" (tr. 3/66, 108).

Asset Purchase Agreement

16. The record contains a 12 July 2005 email to Mr. Carr, founder and CEO of DSI (tr. 1/66), and Mr. Tuttle, DSI's senior contracts administrator for most of DSI's involvement with AFNAFPO (tr. 2/19), forwarding a draft letter of intent and transmittal letter, on DSI letterhead, from Mr. Carr to Mr. Brubaker, Acting CEO SusQTech (R4,

7

tab 101). The draft letter documented DSI's interest in purchasing SusQTech's IBPS software. The draft transmittal letter included the following language:

> The fact that the IP involved in the software is owned both by SusQTech and the Government. This places the customer (the government) in a very strong negotiating position since they can indeed "walk away", greatly reduces any intrinsic value of the software and also diminishes the value of the contract vehicle.

(R4, tab 101 at 3199)

17. On 29 July 2005, DSI and SusQTech entered into an Asset Purchase Agreement whereby DSI purchased "All right, title and interest" in SusQTech's intellectual property in IBPS for $50,000 (app. supp. R4, tab 214 at 6336-47; tr. 1/119).

Events Leading Up to the Novation

18. Mr. Carr testified he had no intent to simply step into SusQTech's shoes (tr. 1/129), and if DSI was to take over the IBPS contract he wanted to "start fresh" (tr. 1/131). He testified that he wanted to know if AFNAFPO had a license to use IBPS and to that end they looked for the words "term" or "perpetual" or other wording that would "have given us a clue that there was some, something that would be important to us" (tr. 1/139). Mr. Carr relied upon Mr. Tuttle to investigate AFNAFPO's usage rights in IBPS (tr. 1/138-39). Mr. Tuttle did the in-depth review of the contract and Mr. Carr would look at things Mr. Tuttle brought to his attention (tr. 1/200-01, 203-04). Mr. Tuttle read Mod. M0015 and did not see the word "perpetual"; he interpreted the language "AFNAFPO's rights are continuous and non-exclusive" to be different than "perpetual" rights. He testified about his interpretation of Mod. M0015, "[b]ecause continuous in my mind, doesn't mean perpetual. Continuous can mean 7-24, 365, right to use, until the contract ends. That's a reasonable interpretation." (Tr. 2/31; R4, tab 210) Mr. Tuttle does not recall discussing Mod. M0015's intellectual property rights with AFNAFPO (tr. 2/124-25). Mr. Carr recalled:

> What we found was in essence a bounded contract, that pretty much, from my perspective, was a lease arrangement, okay, that when it ended, everything ended with it, and that's exactly what we wanted. That was good, you know, from our perspective.

(Tr. 1/139-40)

8

19. On 6 July 2005, Mr. Doug Miller, SusQTech, sent an email to Mr. Tuttle with a copy to Mr. Carr. The email included the following:

> AFNAFPO has long held the belief that SusQtech and its predecessors owned the IBPS intellectual property. *Mod 15 was executed at the request of AFNAFPO to clarify their perpetual rights to use the application and ability to establish other NAF organization users on the system.* Based on proximity of several Air Force and Navy bases throughout the world, AFNAFPO has expanded the user base of the system to include naval installations to enhance purchasing efficiency and buying power of both units.

(R4, tab 102 at 1002-03) (Emphasis added) Mr. Carr testified about this email:

> The second sentence puts, I guess, him [Tuttle] on notice that Mr. Miller's belief is that Mod 15 was executed to clarify the perpetual rights to use the application, and ability for other NAF systems.
>
> That's Mr. Miller's opinion, and I'm positive Pete [Tuttle] would have looked in the language of the mod, and I don't believe he would have taken Mr. Miller at his word, nor if that was the case, it would have simply had bearing to him as we negotiated Mod 22. I mean this is strictly, you know, Doug's [Miller] opinion of this, and you know, that's what it is.

(Tr. 1/232-33) Concerning "Doug's opinion," Mr. Carr testified that he had no reason "to believe it or disbelieve it" and it had "no bearing" on DSI's negotiations with AFNAFPO (tr. 1/233). He testified that what Doug thinks "doesn't matter" (tr. 1/234), and:

> I mean there's nothing here in terms of what was meant by it, you know. If the government had assumed that or they wanted that, I mean I assume at any point in time they could have brought up the words. I mean I don't know why the onus is always, you know, from your perspective seems to be on me to have them be informed of every little thing.

(*Id.*)

9

20.  Mr. Tuttle reviewed the contract between SusQTech and AFNAFPO to assess risks for Mr. Carr (tr. 2/20-21).  He reported the results of his analysis to Mr. Carr via a 7 July 2005 email that included:

> c.  Intellectual Property.  Mod 15 says contractor owns it and AFNAFPO is restricted from selling, transferring or assigning to a third party.  Also limits third party usage. *HOWEVER, it also says AFNAFPO requires a S/W Escrow and the language gives AFNAFPO great discretion in what to do with the escrowed SW.*  An escrow will be required, per DM, by the time of R4 delivery.  **DSI needs to have this escrow language changed and use our existing escrow on this deal.**

(Tr. 2/22; app. supp. R4, tab 211 at 86) (Italics added)  Mr.Tuttle does not think he saw Mr. Miller's 6 July 2005 email before he sent his analysis to Mr. Carr because he did not mention the "perpetual rights" to use in the analysis (tr. 2/27, 112).  He testified about Mr. Miller's 6 July 2005 email that included the "perpetual rights" language.  Mr. Tuttle understood that AFNAFPO and SusQTech believed that AFNAFPO's right to use IBPS extended beyond the term of their contract.  (Tr. 2/24)  Mr. Tuttle did not recall if he discussed Mr. Miller's 6 July 2005 email with Mr. Miller (tr. 2/103-04).  Mr. Tuttle does not recall if he ever discussed his risk analysis (app. supp. R4, tab 211 at 085-87) with AFNAFPO even though meeting with AFNAFPO was one of his recommendations to Mr. Carr (tr. 2/21, 119-20; app. supp. R4, tab 211 at 87).

21.  Mr. Tuttle drafted the novation agreement between DSI and SusQTech that included the language in paragraph (a)(1):

> The term "the Contract," as used in this Agreement, means the above Contract and modifications made between the Government and SMC before the effective date of this Agreement, and includes Modification M01 through M0021.  Modifications M01 through M0007, M0009, M0010 (FY04 maintenance portion), M0011, M0015, M0019 and M0020 are complete and accepted by the Government.

(App. supp. R4, tab 214 at 6331)  Mr. Tuttle testified that this language "essentially killed Mod 15" (tr. 2/31).  He testified that DSI was "absolutely not going to step into SusQTech's shoes" and that he put limitations in the novation (tr. 2/35).  In novation paragraph (a)(1) he listed modifications, including Mod. M0015, as "complete and accepted by the Government" (app. supp. R4, tab 214 at 6331).  By that he meant, "[t]hat there are no further expectations on the part of the Government for anything regarding

10

those mods, including deliverables....I was trying to mitigate the open ended nature of AFNAFPO's understanding of the rights. Meaning, if they thought they had perpetual rights and it was tied into Mod 15, then that sentence ends those rights. It bounds them." (Tr. 2/36-37, 131) His intent was to "kill" all of the rights, duties or obligations arising out of Mod. M0015 (tr. 2/40). However, this intent was not communicated to AFNAFPO.

22. By email dated 11 August 2005, Mr. Tuttle sent Mr. Henson, AFNAFPO, a signed[4] version of the novation agreement between SusQTech and DSI (app. supp. R4, tab 214 at 6331-47). The novation included the language in paragraph (a)(1), "[m]odifications M01 through M0007, M0009, M0010 (FY04 maintenance portion), M0011, M0015, M0019 and M0020 are complete and accepted by the Government" (R4, tab 214 at 6331). Mr. Tuttle did not recall discussing his draft novation agreement with AFNAFPO (tr. 2/130; app. supp. R4, tab 214 at 6631-34). Mr. Henson recalls receiving the 11 August 2005 email from Mr. Tuttle transmitting a draft novation agreement between DSI and SusQTech (tr. 3/67; app. supp. R4, tab 214 at 6329-34). The purpose of the draft novation was to replace SusQTech with DSI (tr. 3/67). On 19 August 2005, Mr. Henson sent an email to Ms. Jones, Mr. Sawyer and Ms. Runkle with an attachment listing concerns about the novation agreement he received from Mr. Tuttle (tr. 3/68; app. supp. R4, tab 222). The first "concern" listed was:

> (a) 1 M0015 Intellectual Property rights for IBPS. That source code used for the development and deployment of the IBPS system will be place [sic] in escrow and updated in conjunction with deployment of new versions. With each software update, the code will change. M0015 is not completed as stated in the subject paragraph. This requirement will end only when IBPS is complete with no further changes or updates.

(App. supp. R4, tab 222 at 10836) Mr. Henson testified Mod. M0015 was not complete for the purposes of the escrow and AFNAFPO wanted the "requirement to go forward and not be complete" and "[s]o the duty for the contractor to place code in escrow is what we are trying to convey here" (tr. 3/69). On cross-examination he explained further, "[w]hat I am saying here, if you read the document, it is talking about source code being placed in escrow and that if you do away with Mod M0015, you are doing away with escrow deposits. So if you don't - - Mod 0015, if we are still doing development, you can't stop the requirement for escrow deposits." (Tr. 3/113-14) In reviewing paragraph (1) of the draft version of the novation sent to Mr. Henson by Mr. Tuttle, Mr. Henson

---

[4] Although the novation was signed, it was considered a draft by Mr. Henson, Branch Chief, AFNAFPO (tr. 3/67).

11

believed that DSI thought that their duties under Mod. M0015 had ended and he did not agree and changed the novation to clarify (tr. 3/104). Mr. Henson testified:

> The rights we had already established were continuous forever. So we didn't - - there was never any question about what our rights were under Mod M0015.
>
> So the only thing that could be complete or completed or any duty of the contractor at that point would be the escrow. And that is clearly outlined in the notes that we assessed and put together and wrote language to try to address.

(Tr. 3/105) Mr. Henson recalled that in negotiating the novation, DSI had specific requests to deal with stop work orders so that the work could be resumed (tr. 3/84).

23. Ms. Jones received a copy of the draft novation agreement from Mr. Hamer, DSI (tr. 2/186; app. supp. R4, tab 215). She recalled that in discussing the novation the IBPS team wanted to "lay out what work was left to be done on the contract" (tr. 2/186-87, 196). She did not interpret the novation as an attempt by DSI to "curtail rights and duties listed under Modification 15" (tr. 2/188). However, at the hearing Ms. Jones was confronted with the deposition testimony where she testified that AFNAFPO changed the language referring to Mod. M0015 in the draft novation because the IBPS team was concerned "if they said that was closed that they would be taking away what we had just put into Mod 15, which gave us the right to use IBPS software" (tr. 2/190). Ms. Jones testified that "Mod 15 gave us the right to use IBPS forever" (tr. 2/193). She testified that the language in the draft novation that Mod. M0015 was "complete and accepted by the Government" was "one of our major concerns in there because we needed to make sure that we had the right to get the software if we ever needed the source code" (tr. 2/193-94). She also testified that they were concerned "[t]hat we would be able to continue to use IBPS" and "we wanted to continue to be able to go forward and use it forever" (tr. 2/195-96).

24. By email dated 26 August 2005, Mr. Henson sent Mr. Tuttle a revised version of the novation agreement in FAR format (tr. 3/69-70; app. supp. R4, tab 223). Paragraph 4 contained revised language written by AFNAFPO:

> 4. Modification M0015 shall remain in effect but will be changed to reflect DSI in lieu of "Susquehanna Technologies". This modification is valid for the entire life of the contract and will not be considered complete until the contract is closed.

(App. supp. R4, tab 223 at 1921; tr. 3/70-71) Mr. Henson explained the purpose of paragraph 4, "[a]gain, going back to the concerns that were outlined at the time, my

understanding of this language is address those concerns that we had in that last document, meaning that escrow agreement, having code in escrow. The requirement of DSI to place code in escrow." (Tr. 3/71) Mr. Henson testified, "[t]here were never any discussions at the time regarding our continuous use rights during the negotiation for the drafting of language associated with Mod M0022" (tr. 3/71-72). Mr. Henson testified that he "[a]bsolutely [did] not" have any intention to limit AFNAFPO's right to use IBPS (tr. 3/72). DSI never suggested that AFNAFPO would have to pay a fee to use IBPS (tr. 3/73). Ms. Runkle testified that AFNAFPO never gave up its right to use IBPS (tr. 3/61).

25. Mr. Tuttle recalled that AFNAFPO wanted the novation agreement to be in a FAR format and sent DSI a copy of the novation agreement in a 26 August 2005 email (tr. 2/44-46; app. supp. R4, tab 223). He couldn't recall if he discussed the novation with Mr. Henson (tr. 2/45). Mr. Tuttle testified that his interpretation of paragraph 4 of the novation agrreement meant at the end of the contract "[i]t was done. No further expectations." (Tr. 2/47-49) Mr. Tuttle does not recall discussing future right to use or licensing fees for the IBPS with AFNAFPO when negotiating Modification No. M0022 (tr. 2/134-35). Mr. Tuttle has no recollection of discussing the final novation agreement with AFNAFPO other than what is in emails in the record[5] (tr. 2/136-37).

Modification No. M0022

26. On 30 September 2005, SusQTech (Transferor), DSI (Transferee), and the AFNAFPO contracting officer (CO) signed the novation agreement transferring the 0027 contract to DSI (R4, tab 32).

27. Modification No. M0022 (Mod. M0022), effective date 5 August 2005 and executed by CO Henson on 4 October 2005, incorporated the novation agreement into the contract (R4, tab 31; tr. 3/63-64; app. supp. R4, tab 233). The purpose of Mod. M0022 was to incorporate the novation agreement recognizing DSI as the new contractor (tr. 3/64-65). The modification contained 12 paragraphs listing all prior modifications and indicating the present status of completion of each and DSI's responsibility, if any, for each (id. at 105). For example, paragraph 1 stated that "Modifications M0001 through M0007, M0009, M0010 (FY04 maintenance portion), M0011, M0019 are complete and accepted by the Government." Paragraph 4 dealt with Mod. M0015:

> 4. Modification M0015 shall remain in effect but will be changed to reflect DSI in lieu of "Susquehanna

---

[5] Mr. Tuttle testified that the documents at app. supp. R4, tabs 226 to 232, reflect his negotiations with AFNAFPO concerning Modification M0022 (tr. 2/50-51). Nothing in these documents discloses Mr. Tuttle's intent to end AFNAFPO's perpetual right to use IBPS.

Technologies". This modification is valid for the entire life of the contract and will not be considered complete until the contract is closed.

(R4, tab 31 at 105) While no money was obligated by Mod. M0022, it recognized that DSI was entitled to invoice for unpaid completed work up to and including Mod. M0020 and any "withheld amount or retainage upon the acceptance of R4 [Release 4]" (R4, tab 31 at 106).

28. Mr. Carr signed Mod. M0022 for DSI (R4, tab 31). Mr. Carr did not personally negotiate Mod. M0022 with AFNAFPO (tr. 1/287, 304). Mr. Carr testified that Mr. Tuttle negotiated the terms and conditions of Mod. M0022 with AFNAFPO (tr. 1/147, 154, 213-15 ). Mr. Carr testified that there had been negotiations leading to Mod. M0022:

> In other words, we had gone through the entire contract. We had listed and gotten joint agreement as to all of the things that we should close down. We had negotiated back and forth. We had entertained the government's counterproposals and Mod 22 was a clean step forward for us.

(Tr. 1/145) Mr. Carr testified about paragraph 4 of Mod. M0022:

> If I look at paragraph four and I read it, this looks like a specific negotiation on Mod 15. Again, you would have to talk to Mr. Tuttle about, you know, the mechanics of that and what went back and forth. It looks to me like this is a clarification on Mod 15, that Mod 15 is again is valid for the life of the contract, which would mean to be at the end of the contract, that it would become closed and done.

(Tr. 1/153) Paragraph 12 of Mod. M0022 reads:

> DSI's liabilities and obligations are limited to the requirements set forth in this Modification M0022. DSI shall have no liability or obligation for any claims and demands under contract F41999-99-C-0027 arising prior to the effective date of this modification. This limitation shall not apply to any future obligation or liability under said contract as modified by Modification M0022.

(R4, tab 31 at 106) Mr. Carr testified that he felt Mr. Tuttle did a good job of wording paragraph 12 "in terms of clearly limiting the fact that we had no liabilities or obligations

of anything in the past" (tr. 1/149-50). Mr. Carr understood that AFNAFPO's right to use IBPS was limited to the duration of the contract by Mod. M0022 (tr. 1/155).

29. Mr. Tuttle does not recall ever telling anyone at AFNAFPO that DSI could not "live with" AFNAFPO perpetual rights to use IBPS or that the intent of Mod. M0022 was to "kill" Mod. M0015 and end any perpetual rights to use IBPS that AFNAFPO might have (tr. 2/154-55). He does not recall discussing the future right to use IBPS or licensing fees for the IBPS with AFNAFPO when negotiating Mod. M0022 (tr. 2/134-35).

## Modification No. M0029

30. Mod. M0029, dated 1 October 2006, extended the period of performance of contract 0027 to 30 September 2007 and added a maintenance agreement and other provisions (R4, tab 43 at 152). It included the following:

> 9) Intellectual Property Ownership, Right-to-Use and Escrow
>
> The rights and responsibilities of the Parties in regards to intellectual property ownership, right-to-use and escrow in Modifications M0015 and M0022 remain in full force.

(R4, tab 43 at 153) Mr. Max Browning, Contract Specialist, drafted Mod. M0029 based on DSI's request to be allowed to continue performance another year to "stabilize" the IBPS software (tr. 3/163). Mr. Browning recalled that Mr. Tuttle said, "Max, we are concerned about you to continue to recognize our rights of ownership and we will continue to recognize your right to use" (tr. 3/165). Mr. Browning testified that paragraph 9 "didn't alter our rights under Mod M0015 and it recognized in Mod M0022" that DSI owned the software (tr. 3/165).

## Amendment 1 to Rider C

31. Rider C to DSI's escrow agreement allows the escrow agreement to be used for IBPS without having to negotiate a new one (R4, tab 243 at 9318). Mr. Carr testified that Rider C to the escrow agreement had nothing to do with ownership or right to use IBPS (tr. 1/180-81).[6]

32. Mr. Browning reviewed Escrow Agreement Rider C and expressed AFNAFPO's concerns in a 2 August 2006 email to Mr. Tuttle:

---

[6] In its brief DSI asserts Rider C confirms "AFNAFPO's limited right-to-use IBPS" (app. br. at 19).

15

We have reviewed the attached Escrow Agreement and have the following concerns: Clause 3, Beneficiary(s), states only active client Beneficiaries holding a current License Agreement with a fee paid Depositor shall have the right to request release of Deposit Materials (Source Code +). Do we have a License Agreement with DSI? There is no provision for any notice to us under Clause 4, Term, if this Escrow is terminated for any reason. In both Clause 8, Section (e) and Clause 12, Section (c), there is language limiting our use of Deposit Materials to the terms of a GSA Schedule Right-to-Use License and Subscription Agreement. The numerous concerns noted herein need to resolved [sic] through a revised Rider C to this Escrow Agreement or our rights to retrieve the Deposit Materials is imperiled. Let me know if you wish to discuss.

(App. supp. R4, tab 243 at 9318) Mr. Browning was concerned that Rider C talked about a GSA license but AFNAFPO's license rights came from Mod. M0015. He was concerned about protecting, "[o]ur right to use continuously." (Tr. 3/148-49) He explained, "we had the right to pull escrow and use continuously free of charge, without any restrictions, other than what was identified as our rights to protect DSI's intellectual property and to use it within our own need for our procurement system" (tr. 3/149). He continued, "we wanted to make sure, undisputed that nothing in that escrow agreement that had language that would impede us from pulling our escrow and use it as intended, our right to use forever free, under Mod M0015" (tr. 3/150-51).

33. Mr. Browning testified that he discussed AFNAFPO's concerns with Mr. Tuttle, "I told Mr. Tuttle that he needed to fix this Rider C to make sure that it reflected our right to use and our ability to pull escrow as intended in Mod M0015. Mr. Tuttle concurred and complied." (Tr. 3/152) On 7 August 2006, Mr. Tuttle emailed Mr. Browning Amendment 1 to Escrow Rider C stating, "I think it addresses the concerns that were mentioned (see yellow highlights)" (app. supp. R4, tab 245 at 3657). Paragraph 2 of the revised Rider C reads, "The Depositor's sole ownership of IBPS and Beneficiaries Right-to-Use are per AFNAFPO Contract F41999-99-C-0027, Modification M0015 as modified by Modification M0022" (app. supp. R4, tab 245 at 3663). Mr. Browning was asked about the language "Modification M0015 as modified by Modification M0022" and testified, "[w]ell my understanding that if Mod M0015 stood on its own, it says Susquehanna has the rights to the ownership. Mod M0022 just identified the new owner." (Tr. 3/156)

34. In September 2007, AFNAFPO determined that it desired DSI to continue IBPS maintenance. Rather than extending contract 0027 which expired 30 September 2007, AFNAFPO planned to issue an order against DSI's GSA schedule contract. (R4, tab 78) The record contains a 20 September 2007 maintenance proposal from DSI that states in part:

### 2 Proposal

DSI proposes a Firm Fixed Price (FFP) effort to include very limited DSI project management and coordination/analysis which will allow DSI to place the vast majority of the effort on code development, code testing and software builds necessary to complete work assignments that will originate and be managed by AFNAFPO.

DSI also proposes that the escrow materials as of 9/30/2007 will be deposited with the escrow agent.

....

### 8 Escrow Materials

Since this effort is to be performed under an entirely new order, DSI proposes that the parties agree that the resultant order includes language that ensures that the understandings, agreements, duties and responsibilities of the parties in F41999-99-C-0027, Modifications 15, 22, 29 and the Rider C of the Escrow Agreement survive the end of F41999-99-C-0027 and are carried forward into the new order.

### 9 Pricing

....

[CLIN]
0001 Technical Support consisting of one           $202,392.00
     (1) DB-Level VI Customization
     (SIN 132-32) per month for eight (8) months

| 0002 | Program Management Support consisting of one (1) DB Level II Customization for eight (8) months | $2,754.00 |

| 0003 | Escrow of Deposit Materials (Open Market) | $2,000.00 |

(R4, tab 64 at 242, 244)

35. On 26 September 2007, AFNAFPO issued Delivery Order No. F41999-07-F-1375 (DO 1375) under a GSA schedule contract for:

[CLIN]
| 0001 | GLAC 1850000<br>IBPS Technical Support consisting of one (1) Level VI Customization per month for eight (8) months<br>See Attached Statement of Work | $202,392.00 |
| 0002 | GLAC 1850000<br>Program Management Support consisting of one (1) Level II Customization for eight (8) months | $2,754.00 |
| 0003 | GLAC 1850000<br>Escrow deposit | $2,000.00 |

(R4, tab 62) Mr. Browning issued DO 1375 for continued maintenance on the IBPS software for eight months (tr. 3/169; app. supp. R4, tab 276 at 3297). The total amount of the Order was $207,146 (*id.*). Although CLIN 0001 references "See Attached Statement of Work," DSI received a FAX copy of the Order that apparently did not include the SOW (R4, tab 66 at 249). There is no statement of work with the copy of the Order at Rule 4, tab 62.

36. DSI prepared a "Revised" version of DSI's Maintenance Proposal entitled, "Air Force NAF Purchasing Office Maintenance Proposal (Revised)," dated 26 September 2007 (the same date as Order 1375), but paragraph eight was re-titled and stated as follows:

18

## 8 Intellectual Property Rights & Escrow Process

....

DSI Rights:

DSI is the sole and exclusive owner of IBPS and all customizations, modifications and updates thereto, including without limitation, the project components, all software object and source codes, developer tools, and user manuals (collectively the "IBPS Intellectual Property"). DSI, as sole owner of the IBPS Intellectual Property, retains the exclusive right to re-use, modify, update or otherwise change, modify, customize and update the IBPS Intellectual Property. DSI retains all rights in the IBPS Intellectual Property including but not limited to the right to utilize, resell, license and distribute the IBPS Intellectual Property, its processes and technology for purposes and projects unrelated to AFNAFPO.

AFNAFPO Rights:

During the term of this Agreement, AFNAFPO shall have nonexclusive right to use IBPS Intellectual Property in the operation of its electronic eProcurement System. AFNAFPO shall not sell, transfer or assign of [sic] IBPS Intellectual Property to a third party, nor will it allow any third party to use IBPS Intellectual Property in whole or in part other than to provide support for the AFNAFPO eProcurement System. AFNAFPO shall have the right to allow other DoD NAF entities to become users of its eProcurement System subject to the terms of this agreement including any additional compensation due to or to become due to DSI. All rights not hereby specifically granted to AFNAFPO shall remain the sole property of DSI.

Escrow:

DSI and AFNAFPO agree the two party escrow agreement entered into between DSI and Escrow Associates dated February 14, 2005 and the Rider C (Amendment 0001) entered into between DSI and Escrow Associates dated

19

August 10, 2006 shall remain in full force and effect with respect to this Agreement and all related orders. DSI and AFNAFPO further agree that the Rider C Amendment 0001 dated August 10, 2006 will be amended to add the new order number, but in the interim, the heretofore mentioned escrow agreement and Rider C shall remain in effect and shall be deemed to include this order number.

AFNAFPO may request a maximum of four (4) escrow deposits be made during the period of performance.

(R4, tab 68 at 256)

37. On 28 September 2007, Mr. Tuttle emailed Mr. Browning stating that DO 1375 did not include a SOW:

We are in receipt of order (attached), however it did not reference any of the proposed language regarding IP ownership and the escrow process that we discussed or that was included in our proposal (also attached). The fax we received did not contain the SOW referenced in the order so we were unable to verify whether or not AFNAFPO accepted our proposal and/or included the language required by DSI as part of the follow-on contract/order to transition the IP protections, etc. from the previous contract per our discussion.

I've left you a voicemail but want to back it up with this note. The order transmitted via fax to DSI yesterday does not appear to reflect the discussion points or the intent of the parties.

Hopefully, this was simply an administrative oversight on the part of AFNAFPO while cutting the order.

Please contact me ASAP so we can sort through this today.

(R4, tab 66 at 249; app. supp. R4, tab 276 at 3294) AFNAFPO responded stating, "We are in agreement with your proposal and will be sending an admin mod it [sic] incorporate" (R4, tab 66 at 248). Mr. Browning testified that Mr. Tuttle was concerned that the parties continued to recognize their respective rights and that there was no mention of changing or altering rights (tr. 3/177-78).

38. On 1 October 2007, AFNAFPO issued unilateral Modification No. M0001 (Mod. M0001) to DO 1375 stating, "The purpose of this modification is to incorporate the attached Statement of Work (SOW) 'Air Force NAF Purchasing Office Maintenance Proposal (Revised)['] dated September 26, 2007 to the Delivery Order" (R4, tab 67). There was no change in the price of the order associated with the modification. The unilateral modification was signed only by CO Browning. (*Id.*) Mr. Browning used an "administrative mod" to add the SOW. He testified that if Mr. Tuttle, "had brought up to me at any one point during this process that our rights were going to cease or change, that delivery order would have been retracted and it would have been nullified immediately." (Tr. 3/179)

39. Mr. Browning testified about the first sentence in paragraph 8 Intellectual Property Rights & Escrow Process, AFNAFPO Rights, of the 26 September 2007 maintenance SOW that read, "During the term of this Agreement AFNAFPO shall have nonexclusive right to use IBPS Intellectual Property in the operation of its electronic eProcurement System" (app. supp. R4, tab 276 at 3317). Mr. Browning explained that based on what Mr. Tuttle told him he understood that DSI primarily wanted to "capture their rights in the new code that was going to be developed and I had no problem with that" (tr. 4/25). He stated, "[i]f he [Mr. Tuttle] would have identified any change or intent of a word, then we would have had a serious discussion about it" (tr. 4/26). As to the first sentence he testified, "I gave it no weight, you know. I had no reason to know or predict it had any limitation on our rights." (Tr. 4/27) When asked on cross-examination, "[t]hat sentence does not provide the right to use the IBPS system continuously forever as you just testified. Correct?" Mr. Browning replied, "[t]hat's not my opinion. That's not my interpretation." (Tr. 4/29) He also stated "I did not view this language as changing our rights" (tr. 4/30). The following exchange occurred during cross-examination:

> Q. You viewed the language as consistent with the rights to use the IBPS system as you have testified previously?

> A. I see here AFNAFPO Rights and I go back to Mod 15 as modified as Mod 22 and the language in the escrow agreement that gives me the rights to pull at no cost without limitation, without an end date as the governing factors in my decision here. No indication, no discussion was ever conducted of altering our rights under Mod 15 as modified by 22 which gave you your rights, or DSI's rights, to the intellectual property.

> The sole purpose of me allowing them to put this in there so they could continue to capture their rights on any

21

new code that was developed beyond 30 September. At the end of the eight months whatever code was developed, the intention was that DSI would continue to own that since they developed it and we had no objections to your ownership to that property thereafter.

(Tr. 4/30-31) When asked if he discussed the first sentence with Mr. Tuttle, Mr. Browning answered, "[t]here was no reason to discuss it. He never brought it up." (Tr. 4/32)

40. Mr. Browning was asked, "Did Mr. Tuttle or anybody else at DSI tell you that the sentence 'During the term of this agreement AFNAFPO shall have non-exclusive right to use IBPS intellectual property in the operation of its electronic eProcurement System,' would result in the loss of your right to use when that delivery order terminated?" He responded, "Absolutely not." (Tr. 4/44-45)

The Claim and Appeal

41. On 28 April 2009, DSI submitted an invoice in the amount of $5,432,388.00 to AFNAFPO for two years of "Right to Use License" fees for IBPS[7] software (R4, tabs 69, 70).

42. On 10 June 2009, AFNAFPO returned DSI's invoice "without action" stating that "AFNAFPO enjoys continuous and ongoing rights to use the IBPS software, as evidenced by the escrow provisions which authorized AFNAFPO to retrieve the software's source code for use in furtherance of AFNAFPO purposes" (R4, tab 71).

43. On 15 June 2009, DSI responded to AFNAFPO's 10 June 2009 response to DSI's invoice (R4, tab 72). DSI took the position that AFNAFPO's right to use IBPS software license free existed only so long as AFNAFPO maintained a valid contract with DSI (*id.*).

44. On 26 January 2010, DSI submitted a certified claim to AFNAFPO, referencing Contract 0027, including an invoice for $8,148,582.00 for three years of "Right to Use License"[8] (R4, tabs 51, 52).

45. On 18 March 2010, the AFNAFPO responded to DSI's claim stating in part:

---

[7] The invoice refers to "ProTrac Right to Use License" that is on the GSA schedule, but it is clear in the "NOTES AND ASSUMPTIONS" that the invoice is for the use of IBPS software.

[8] The invoice uses the "ProTrac Right to Use License" rate from DSI's GSA schedule.

The IBPS Software solution at issue was developed for AFNAFPO by DSI's predecessor in interest (Judd's Online) in accordance with the subject nonappropriated fund contract [contract 0027], awarded in August 1999. Contract Modification 15 (which was entered into by Susquehanna Technologies, another predecessor in interest of DSI) incorporated specified Intellectual Property Rights. AFNAFPO was expressly afforded the "continuous and non-exclusive" right to employ the IBPS solution to operate an electronic eProcurement system for the AFNAFPO organization. Moreover, Modification 15 required that all source code used for the development and deployment of the IPBS system be placed in escrow. AFNAFPO was granted broad authority to retrieve the source code from escrow. Specifically AFNAFPO could retrieve all source code from escrow in the event that it should "choose to either support and build upon the IBPS system itself, or engage a third party to provide support and enhancements for AFNAFPO." AFNAFPO's continuous rights also permitted the selling, transferring and assigning of software deliverables (including object and source code and developer tools) to any third party to use in support of AFNAFPO activities only.

DSI became Susquehanna's successor in interest via a novation agreement recognized in Modification 22. Per the novation agreement, DSI was bound by the terms and conditions of Susquehanna's contract.

(R4, tab 53) CO Browning found that DSI's claim "does not seek relief arising under the subject contract, the claim is hereby dismissed" (*id.*).

46. On 16 June 2010, DSI filed its appeal with the Board and the appeal was docketed as ASBCA No. 57266. The parties filed cross-motions for summary judgment.

47. On 28 December 2011, the Board issued a decision denying DSI's motion for summary judgment and granting in part AFNAFPO's motion for summary judgment. *DSI*, 12-1 BCA ¶ 34,917. On 14 September 2012, the Board granted DSI's motion for reconsideration and vacated its 28 December 2011 decision and denied all motions. *DSI*, 12-1 BCA ¶ 35,144. A hearing was held 4-7 June 2013.

23

## The Parties

AFNAFPO awarded Contract 0027 to Judd's on 19 August 1999 (finding 5). By novation, Judd's then transferred the contract to SMC Interactive, Inc., who then changed its name to SMC/BlazeNet and then to SMC/SusQTech (findings 7, 8). SusQTech, by novation dated 30 September 2005, transferred the contract to DSI (finding 26). The claim was submitted by DSI. We have jurisdiction to consider this claim and appeal pursuant to the Disputes clause of Contract 0027. (R4, tab 1 at 13)[9]

## Contention of the Parties

DSI argues that AFNAFPO does not have perpetual right to use the IBPS for free. It contends that if AFNAFPO ever had such rights, they were extinguished by Mod. M0022, Mod. M0029 and DO 1375. It is undisputed by the parties that DSI owns the IBPS intellectual property. Therefore, according to DSI, AFNAFPO must pay it a license fee to continue using IBPS.

AFNAFPO argues that by Mod. M0015 the then parties to the contract, SusQTech and AFNAFPO, agreed that SusQTech owned the IBPS intellectual property and AFNAFPO enjoyed a perpetual right to use its version of IBPS for the purpose of operating its electronic eProcurement system for free. AFNAFPO contends that nothing that occurred after DSI took over the contract divested it of its perpetual right to use its version of IBPS for free.

## Mod. M0015

At award, Contract 0027 did not include a provision defining the intellectual property rights of the parties. In Mod. M0015 the parties, SusQTech and AFNAFPO, defined their intellectual property rights in IBPS. The first version of the language, drafted by SusQTech, provided that "AFNAFPO retains a perpetual nonexclusive license to utilize the IBPS system for the purpose of operating an electronic eProcurement system within the AFNAFPO organization." (Finding 9) AFNAFPO had the language changed to "AFNAFPO's rights are continuous and nonexclusive" due to concerns over use of the word "license" but felt the new language afforded AFNAFPO the same rights

---

[9] At DSI's request, we vacated our decision granting partial summary judgment to AFNAFPO to allow DSI time to discover evidence to support its argument that it negotiated with AFNAFPO and AFNAFPO understood and agreed to ending its perpetual right to use IBPS, a meeting of the minds so to speak. The record reveals that DSI was unsuccessful in that endeavor.

as the initial language (finding 10). Before signing Mod. M0015, AFNAFPO verified that it had unlimited rights to use IBPS within DoD (finding 11).

AFNAFPO individuals primarily involved in negotiating Mod. M0015, Ms. Runkle, Ms. Jones, and Mr. Henson, each testified that Mod. M0015 provided AFNAFPO the right to use IBPS "forever" at no cost for the purpose of operating an electronic eProcurement system (findings 13, 14, 15). SusQTech likewise agreed that AFNAFPO enjoyed a perpetual right to use IBPS at no additional cost (findings 9, 11).

Since both parties to Modification M0015 agree that it bestowed on AFNAFPO a perpetual right to use IBPS, we hold that AFNAFPO enjoyed a perpetual right to use its version of IBPS for free.

Asset Purchase Agreement

On 29 July 2005, DSI purchased the IBPS intellectual property from SusQTech. (finding 17). During the negotiations over price leading up to the purchase, DSI apparently believed that both SusQTech and the "government" owned the IBPS intellectual property and that as a result the "government" could "walk away" from the contract (finding 16). DSI therefore understood, before it took over the contract, that AFNAFPO had significant rights in IBPS even though DSI was mistaken in believing AFNAFPO co-owned the IBPS intellectual property. This understanding, although mistaken, should have alerted DSI that AFNAFPO would protect its substantial interest in IBPS.

The Novation

Mr. Carr decided to take over Contract 0027 from SusQTech, but he did not want to "step into SusQTech's shoes" (finding 18). Mr. Carr relied upon Mr. Tuttle to review the contract and bring things of interest to his attention (id.). Mr. Carr was interested in what rights AFNAFPO had to use IBPS (id.). Mr. Carr testified that they would look for words such as "term" or "perpetual" to determine AFNAFPO's license rights (id.). Mr. Carr recalled that Mr. Tuttle found that AFNAFPO's rights were "bounded" and that was good from his perspective (id.). Mr. Tuttle testified that he did not interpret the language of Mod. M0015, "AFNAFPO's rights are continuous and nonexclusive," to be the same as "perpetual rights" (finding 21). We consider DSI's willingness to interpret Mod. M0015, a modification DSI had nothing to do with, without inquiring from either SusQTech or AFNAFPO as to its meaning, to be unreasonable. DSI assumed the risk that its unilateral interpretation was wrong – which it was.

By a 6 July 2005 email, Mr. Miller, SusQTech, informed Mr. Carr and Mr. Tuttle that AFNAFPO requested Mod. M0015 "to clarify their perpetual rights to use the application" (finding 19). Surprisingly, after having seeing the words "perpetual rights,"

the "clue" Mr. Carr was looking for, Mr. Carr dismissed Mr. Miller's email referring to it as his "opinion" and that it "doesn't matter" (*id.*). This testimony is irreconcilable with Mr. Carr's stated interest in AFNAFPO's rights to use IBPS and DSI's search for the word "perpetual" in that regard. Inexplicably, Mr. Carr preferred to rely on his and Mr. Tuttle's interpretation of Mod. M0015 rather than an interpretation from one of the parties that actually negotiated and signed the modification. He seemed to believe that DSI had no reason to tell AFNAFPO it was attempting to end AFNAFPO's perpetual rights to use IBPS, "I mean I don't know why the onus is always, you know, from your perspective seems to be on me to have them be informed of every little thing." (Finding 19) We do not consider AFNAFPO's perpetual rights to use IBPS and DSI's professed attempt to end those rights to be, in Mr. Carr's vernacular, a "little thing."

Based on the above, we conclude that on or about 6 July 2005, Mr. Carr and Mr. Tuttle were on notice that Mod. M0015 gave AFNAFPO perpetual rights to use the IBPS for free.[10] On 7 July 2005, Mr. Tuttle reported to Mr. Carr that AFNAFPO had "great discretion" to use escrowed software and advised that DSI should change the escrow language[11] (finding 20). Armed with this knowledge, Mr. Tuttle wrote the language stating that Mod. M0015 was "complete and accepted by the Government" in the draft novation specifically to "kill" AFNAFPO's perpetual rights to use IBPS (finding 21). Mr. Tuttle, however, never informed AFNAFPO that DSI intended this language to end AFNAFPO's perpetual right to use IBPS (findings 21, 22, 25).

Even though Mr. Tuttle did not disclose his intent to "kill" AFNAFPO's perpetual right to use IBPS, there was concern at AFNAFPO over the language of the draft novation. The main concern was that the escrow requirement could not end until software development concluded. (Findings 22-24) Ms. Jones also expressed her

---

[10] In its brief DSI acknowledges that it understood that "both AFNAFPO and SusQTech seemed to believe that the language of Modification 15 granted a perpetual right to use the current IBPS system" (app. br. at 37-38). DSI then argues, "[a]s a result, DSI clearly and unequivocally proposed the end to all rights and duties stated in Modification 15 by proposing that it be complete and accepted by the government before DSI stepped into the IBPS Contract" (app. br. at 38). If this were true, DSI might prevail – but it is not true. The language of paragraph 4 of Mod. M0022, "complete and accepted," is far from a clear and unequivocal statement communicating to AFNAFPO DSI's intent to divest AFNAFPO of its perpetual right to use IBPS. It is clear from the record that AFNAFPO did not know what DSI intended nor would it have ever agreed to give up its perpetual right to use IBPS. (Findings 22-24, 30, 32, 33, 37-40)

[11] Mr. Tuttle testified that he must not have seen Mr. Miller's 6 July 2005 email when he reported his analysis to Mr. Carr because he did not refer to "perpetual rights" (finding 20).

concern over AFNAFPO's ability to use the IBPS "forever" (finding 23). AFNAFPO revised the novation to satisfy these concerns, comply with FAR format and clarify the requirement to continue to place code in escrow (finding 24) Ms. Runkle, Mr. Henson, and Ms. Jones each testified credibly that AFNAFPO did not give up its right to use IBPS (findings 22, 23, 24). Mr. Tuttle, however, interpreted the new language to have the same effect as his language and end AFNAFPO's perpetual right to use IBPS at the end of Contract 0027 (finding 25). Mr. Tuttle did not disclose his interpretation to AFNAFPO (*id.*). The second, FAR formatted version, of the novation was signed on 30 September 2005 (finding 26).

Mod. M0022

Mod. M0022, effective date 5 August 2005, incorporated the novation agreement into Contract 0027 (finding 27). It repeated the novation language that Mod. M0015 "is valid for the entire life of the contract and will not be considered complete until the contract is closed" (*id.*). Mr. Carr testified that paragraph 4 clarified Mod. M0015 and it would be "closed and done" at the end of contract 0027 (finding 28). He likewise testified about paragraph 12. Although Mr. Carr signed Modification M0022, we give little weight to Mr. Carr's testimony because he was not involved in the negotiations and never conveyed his interpretation to AFNAFPO. Mr. Tuttle, who actually negotiated Mod. M0022, also did not disclose to AFNAFPO his intent that Mod. M0022 "kill" AFNAFPO's perpetual right to use IBPS. (Finding 29)

We are dubious that the phrase "[t]his modification is valid for the entire life of the contract and will not be considered complete until the contract is closed" can reasonably be interpreted on its face to divest AFNAFPO of its perpetual right to use IBPS, a right, according to DSI's claim, worth tens of millions of dollars over time. DSI, on notice that AFNAFPO had a perpetual right to use IBPS for free, endeavored to divest AFNAFPO of that right through the language of the novation and Mod. M0022 without disclosing its intention and interpretation to AFNAFPO. It now asks the Board to enforce its undisclosed interpretation and divest AFNAFPO of its perpetual right to use IBPS – this we will not do. It is well established that an undisclosed intent/interpretation is irrelevant in interpreting contract language. *Andersen Consulting v. United States & Computer Sciences Corp.*, 959 F.2d 929, 934 (Fed. Cir. 1992) ("[T]he 'subjective unexpressed intent of one of the parties' to a contract is irrelevant."); *ITT Arctic Services, Inc. v. United States*, 524 F.2d 680, 684 (Ct. Cl. 1975) (In attempting to give effect to the contracting parties' intent, the court will not consider the "subjective unexpressed intent of one of the parties.").[12]

---

[12] In its brief DSI argued that AFNAFPO failed to disclose its interpretation that paragraph 4 of Mod. M0022 only affected the escrow requirements (app. br. at 39-40), however, the dispute relates to DSI's interpretation that paragraph

27

Mr. Carr and Mr. Tuttle never "put their cards on the table" and explained to AFNAFPO that the only way DSI would take over the contract was if AFNAFPO gave up its perpetual rights to use IBPS. This entire dispute could have been avoided if DSI had simply clearly disclosed to AFNAFPO what it wanted.

Mod. M0029

Mod. M0029 included language similar to what we have seen before in Mod. M0022 (finding 30). We do not interpret this language to unambiguously state that AFNAFPO loses its perpetual right to use IBPS. DSI's true intent remained undisclosed. (*Id.*) Mr. Browning testified that Mod. M0029's language, "[t]he rights and responsibilities of the Parties in regards to intellectual property ownership, right-to-use and escrow in Modifications M0015 and M0022 remain in full force" did not "alter our rights." We agree. As stated above, DSI's subjective unexpressed interpretation is irrelevant.

Rider C

We agree with Mr. Carr that Rider C has nothing to do with AFNAFPO's right to use IBPS (finding 31). However since in its brief DSI contends Rider C supports its arguments, we briefly deal with it (*id.*).

Mr. Browning reviewed Rider C and expressed concerns (finding 32). He testified that he told Mr. Tuttle to "fix this Rider C to make sure that it reflected our right to use and our ability to pull escrow as intended in Mod M0015" and that Mr. Tuttle "concurred and complied" (finding 33). Mr. Tuttle emailed Amendment 1 to Rider C to Mr. Browning stating he thought he had addressed Mr. Browning's concerns (*id.*). DSI again relies on the language, "Modification M0015 as modified by Modification M0022" as support for its interpretation; we have already determined that this language does not unambiguously communicate to AFNAFPO that it lost its perpetual right to use IBPS and DSI's intent remained undisclosed. Mr. Browning was asked about the language and testified "Mod M0015 stood on its own" and "Mod M0022 just identified the new owner." (*Id.*) We conclude there is nothing in Rider C that supports DSI's position.

DO 1375

We must also consider the interpretation of the language in Mod. M0001 to DO 1375. The original 20 September 2007 Statement of Work (SOW) for the maintenance effort included paragraph "**8 Escrow Materials**" that recited "[m]odifications 15, 22, 29 and the

---

4 divests AFNAFPO of its perpetual right to use IBPS, an interpretation that was never disclosed to AFNAFPO.

Rider C of the Escrow Agreement survive the end of F41999-99-C-0027 and are carried forward into the new order" (finding 34). DO 1375 was issued on 26 September 2007 in the amount of $207,146 to provide an additional eight months of technical support, program management support and to pay for escrow deposits according to the original SOW (finding 35). Also on 26 September 2007, DSI revised its maintenance proposal SOW rewriting paragraph eight and changing the name from "**Escrow Materials**" to "**Intellectual Property Rights & Escrow Process**" (findings 34, 36). The new version of paragraph 8 included a subparagraph entitled "AFNAFPO Rights" that included the language, "[d]uring the term of this Agreement, AFNAFPO shall have nonexclusive right to use IBPS Intellectual Property in the operation of its electronic eProcurement System" (finding 36).

On 28 September 2007, DSI emailed AFNAFPO stating that it had received a fax copy of DO 1375 that did not contain a copy of the SOW (finding 37). DSI stated that it was "unable to verify whether or not AFNAFPO accepted our proposal and/or included the language required by DSI as part of the follow-on contract/order to transition the IP protections, etc. from the previous contract per our discussion." DSI also stated, "[t]he order transmitted via fax to DSI yesterday does not appear to reflect the discussion points or the intent of the parties." (*Id.*) AFNAFPO responded to DSI's 28 September 2007 email on the same day stating "[w]e are in agreement with your proposal and will be sending an admin mod it [sic] incorporate" (*id.*). On 1 October 2007, AFNAFPO issued unilateral administrative Mod. M0001 to DO 1375 incorporating the 26 September 2007 revised SOW (finding 38). It is the language of the 26 September 2007 revised SOW that DSI relies upon to support its argument that AFNAFPO's perpetual rights to use IBPS ended when DO 1375 ended.

DSI's reliance is misplaced. That AFNAFPO's rights were to be maintained "during the term of the agreement," says nothing about the status of those rights thereafter. Given the importance of this matter and the potential monetary impact involved, if DSI intended that AFNAFPO's perpetual rights be terminated at the expiration of DO 1375, it should have used such language. It did not do so. Mr. Browning understood that the purpose of the SOW was to ensure that DSI had ownership to any new software developed during the performance of DO 1375, "[t]he sole purpose of me allowing them to put this in there so they could continue to capture their rights on any new code that was developed beyond 30 September (finding 39). He testified that if he had any indication that DSI was trying to end AFNAFPO's perpetual rights to use IBPS he would have "retracted" and "nullified" DO 1375 (finding 38). Based on the same case law we cited above, DSI's undisclosed interpretation that the language of Mod. M0001 divested AFNAFPO of its perpetual rights is irrelevant and will not be considered. We conclude that Mod. M0001 to Order 1375 did not serve to divest AFNAFPO of its perpetual right to use IBPS.

## CONCLUSION

Throughout the entire course of its contracts with AFNAFPO, DSI failed to disclose that DSI's interpretation of the language in the modifications was that it divested AFNAFPO of its perpetual right to use IBPS. The record is devoid of any evidence that AFNAFPO either knew of DSI's interpretation or would have agreed to it if it had. DSI's appeal is denied.

Dated: 4 August 2014

CRAIG S. CLARKE
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

JACK DELMAN
Administrative Judge
Acting Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 57266, Appeal of Distributed Solutions, Inc., rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals